

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00137-CV

IN THE INTEREST OF B.M.,
A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98390-J13

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

This is an ultra-accelerated appeal[2] in which Appellant J.P.F. (Father)

appeals the termination of his parental rights to his daughter, Belinda.[3]  In a

---

[1]See Tex. R. App. P. 47.4.

[2]See Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[3]See Tex. R. App. P. 9.8(b)(2) (requiring court to use alias to refer to a minor in an appeal from a judgment terminating parental rights).

single issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in Belinda's best interest. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview

Father has never seen his only child Belinda, who was born on October 23, 2011, because he has been incarcerated her entire life. At the time of the termination trial on April 22, 2014, Father was in prison serving a fifteen-year sentence for the first-degree felony of injury to a child—Belinda's half-sister Sharon[4]—that had occurred on or about July 1, 2011.[5] Because Father challenges only the best-interest finding, we will detail the evidence presented at the termination trial that is pertinent to that finding.

### B. The Injury to Sharon Caused by Father

Before Sharon was injured, she was crawling, pulling herself up, and walking around the coffee table. On the day he inflicted the injury, Father took methamphetamine, knowing that he would be the only one watching nine-month-old Sharon that day. Father initially told law enforcement and Child Protective

---

[4]See Tex. R. App. P. 9.8(b)(2).

[5]In his brief, Father stipulates that he was convicted for being criminally responsible for the serious injury of a child under Texas Penal Code section 22.04 and that a ground for termination—Texas Family Code section 161.001(1)(L)—has been met. See Tex. Fam. Code Ann. § 161.001(1)(L) (West 2014). The record contains a copy of the conviction dated June 27, 2012.

2

Services (CPS) that he had left Sharon in her playpen while he had changed his clothes and that she was unresponsive when he returned; he later changed his story and said that he had dropped Sharon on a concrete floor; and he ultimately admitted that he had aggressively and violently thrown Sharon onto a concrete floor because some dogs had gotten out of his back yard. Father admitted that his actions caused a fracture in Sharon's skull. Father knew that Mother was pregnant with his child, Belinda, when he injured Sharon.

Following the injury inflicted by Father, Sharon remained in the hospital for almost two weeks and stayed on life support for two days because she was not breathing on her own when she arrived at the hospital. After her first week in the hospital, Sharon underwent brain surgery to repair a tear in the lining of her brain. While she was in the hospital, Sharon experienced seizures and was required to take seizure medication for a year following the incident.

After Sharon was released from the hospital, she was not able to crawl and was frustrated and angry that she could not crawl. Sharon eventually relearned how to crawl, but it took her a long time to relearn how to pull herself up. Sharon underwent physical therapy for six months and had to wear braces on her ankles. Sharon did not start walking until she was fourteen months old. She started speech therapy in September 2013 and was still in speech therapy at the time of the termination trial. Maternal Grandmother, who was Sharon's caretaker at the time of the termination trial, testified that the injury "happened at such an early age that [the neurologists she sees annually to check her development are]

3

hoping . . . everything works around the injury because there will be [a] permanent brain injury there."

Maternal Grandmother also testified that Sharon might not be aware of the exact incident that occurred but explained that Sharon is aware of something because she has had night terrors that awaken her with screams and send her running to Maternal Grandmother in the middle of the night. As of the time of the termination trial, Sharon was still experiencing night terrors, which were attributed to the incident.

## C. The Removal Underlying This Case

In May 2013, Sharon and Belinda lived with their Maternal Grandparents. Mother had joint conservatorship of Sharon with Maternal Grandmother, and Mother was given some periods of possession during that time. While Maternal Grandmother was sleeping, Sharon sustained an arm fracture. Based on that injury, the Texas Department of Family and Protective Services (the Department) removed both Sharon and Belinda because the Department was concerned that Sharon's parents were not able to protect her.[6] Sharon and Belinda were returned to their Maternal Grandparents shortly after the removal.

---

[6]As of the time of the termination trial, Mother had provided various explanations for Sharon's arm fracture, but the Department did not have a definite understanding of where Sharon's injury had occurred or whether it was nonaccidental trauma. It is undisputed that Father was incarcerated on the date this injury to Sharon occurred and that he was not the cause of the children's removal in 2013.

4

Heather South, a supervisor with the Department, testified that the extraordinary circumstances about this case that caused the Department to seek termination of Father's parental rights but not Mother's parental rights included

> [t]hat an individual's been sentenced to 15 years for hurting a small child, and we have small children, and his daughter is a small child involved in this case. . . . He really hurt somebody, and it could have been fatal. And so I think that's where the extreme comes from. And it's not just the physical trauma. It's the emotional trauma to these children.

South testified that Father could be paroled at any time from the point when Belinda is seven and a half years old to fourteen and a half years old, and South opined that Belinda would be vulnerable to physical injury by Father.[7]

### D. Belinda's Status

South testified that Belinda was doing well with her Maternal Grandparents, that all her needs were met, and that she was in a loving home environment. The Court-Appointed Special Advocate (CASA) for Belinda also testified that she is thriving in her placement with her Maternal Grandparents and seems very happy and well cared for.

Maternal Grandmother testified that she and her husband had adjusted their work schedules to care for Sharon and Belinda. Maternal Grandmother

---

[7]South testified, "I understand that [Father] may be maximally sentenced until 2026, but he can be paroled before then and before [Belinda]'s 18. I think just, in my opinion, gambling with the what ifs of her and his incarceration and their emotional well-being is not something I'm in favor of."

5

testified that Belinda was doing really well but that she mumbled a little and so her doctor had recommended speech therapy.

Maternal Grandmother testified that Sharon and Belinda follow each other around the house and that they are "really, really close" and do not like to be separated. Maternal Grandmother said that because the girls are so bonded to each other, it would be emotionally detrimental to the girls if they were separated to live with different relatives.

Maternal Grandmother testified that someday the girls will know about the injury Father inflicted on Sharon because Maternal Grandmother will have to explain the surgical scar that starts on Sharon's head and goes to the back of her neck. Maternal Grandmother opined that it would be emotionally hard and traumatic on Belinda to know that Father had hurt Sharon to the point where she was on life support.

Maternal Grandmother opined that she would be certified to foster through Fostering Connections Program by the end of April or the beginning of May 2014. Maternal Grandmother's understanding was that if she and her husband were approved by Fostering Connections, they would receive financial support going forward.

### E. Father's Plans

Father admitted that he had a history that he was not proud of. Father testified that he had provided no financial support to Mother while she was pregnant with Belinda, that he had not provided any support for Belinda since her

birth, and that he would not be able to provide any support for her until at least 2019. Father testified that upon his release, he planned to have a relationship with Belinda and wanted them to "[d]o everything together" and said that he would get a job to support Belinda.

### F. Recommendations

Father testified that it was not in Belinda's best interest for his parental rights to be terminated because he wanted her to know who he is and who his family is. Father said that his family wants to be involved in Belinda's life. Father asked the court not to terminate his parental rights to Belinda.

Paternal Grandmother desired Father to have involvement with Belinda and testified that it was in Belinda's best interest to have a relationship with Father's side of the family. Paternal Great-Grandmother also testified that she wants to have a relationship with Belinda

South testified that it was in Belinda's best interest for Father's parental rights to be terminated because he cannot protect her from harm due to his previous violence toward children and because the only parenting abilities that the Department had seen from Father were not positive but instead included that he was violent and had hurt a child, which was a concern. South testified that Belinda and Sharon have such a strong bond that it would be mentally and emotionally upsetting and damaging for Belinda to go visit the perpetrator who had harmed her sister, as well as damaging to Sharon when Belinda returns from visits and talks about her experiences with Father. South testified that this could

7

cause Sharon to relive her experiences and that there could be long-term trauma and emotional scarring. South agreed that the children would learn about what had happened as they grow up, but she clarified that thinking about the trauma is "far different from being put in a room with the perpetrator of violence." South testified that it was not in the best interest of Belinda to remove the Department as managing conservator and to appoint Maternal Grandparents because Maternal Grandmother was becoming licensed through the Fostering Connections Program and needed to foster the children for six months prior to being able to negotiate for long-term permanency care assistance. South therefore believed that it was in Belinda's best interest to terminate Father's parental rights, to appoint the Department as permanent managing conservator, and to have Maternal Grandmother continue as possessory conservator.

Maternal Grandmother opined that it was in Belinda's best interest for Father's parental rights to be terminated because he had a history of violence and methamphetamine use. Maternal Grandmother asked the trial court to name the Department as the permanent managing conservator for Belinda until Maternal Grandmother had completed her six months of licensing with Fostering Connections.

The CASA volunteer recommended that the trial court terminate Father's parental rights to Belinda. The CASA volunteer testified that it was in Belinda's best interest to have Father's parental rights terminated because of the potential for emotional trauma to Sharon.

The children's ad litem also recommended the termination of Father's parental rights.

## G.  Trial Court's Disposition

After hearing the testimony above, the trial court found by clear and convincing evidence that Father had, among other things, been convicted for being criminally responsible for the serious injury of a child and that termination of the parent-child relationship between Father and Belinda was in Belinda's best interest.  The trial court ordered the termination of the parent-child relationship between Father and Belinda.  Father thereafter perfected this appeal.

## III.  LEGALLY AND FACTUALLY SUFFICIENT EVIDENCE SUPPORTS THE BEST-INTEREST FINDING

In his sole issue, Father argues that the evidence is legally and factually insufficient to support the finding that termination of his parental rights is in Belinda's best interest.  Father contends that he has committed no offending behavior toward Belinda and that the facts weigh heavily in favor of his parental rights remaining intact.

## A.  Burden of Proof and Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, "[w]hen the State seeks to sever

permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 n.1 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

10

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the

11

child.  Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

If, in light of the entire record, the disputed evidence that a reasonable factfinder

could not have credited in favor of the finding is so significant that a factfinder

could not reasonably have formed a firm belief or conviction in the truth of its

finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the

child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and

permanent placement of the child in a safe environment is also presumed to be

in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2014).

We review the entire record to determine the child's best interest.  *In re

E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).  Nonexclusive factors that the trier of

fact in a termination case may use in determining the best interest of the child

include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### B. Analysis of Evidence Under the *Holley* Factors

With regard to the desires of the child, Belinda was two and a half years old at the time of the termination trial and did not testify. Belinda was not bonded to Father; she had never seen Father and was not likely to see him for many years because he had served only two and a half years of his fifteen-year prison sentence. The evidence was speculative on Father's ability to provide financially for Belinda after his release from prison, and no evidence was presented on the housing, if any, that Father would be able to provide for Belinda after his release from prison. Belinda was thriving in her placement with her Maternal Grandparents, which was described as a "loving home environment." The trial

13

court was entitled to find that this factor weighed in favor of termination of Father's parental rights to Belinda.

As for the emotional and physical needs of Belinda now and in the future, the record revealed that all of Belinda's needs were being met in her placement with her Maternal Grandparents. Maternal Grandmother testified that Father does not have the ability to provide for the emotional and physical needs of Belinda now and in the future. Father testified that he would obtain employment following his release from prison and that he and Belinda would do everything together. Because the evidence revealed that Father had never provided for Belinda, including while Mother was pregnant with Belinda, the trial court was entitled to find that this factor weighed in favor of termination of Father's parental rights to Belinda.

With regard to the emotional and physical danger to Belinda now and in the future, South testified that no matter when Father is released from prison, he would remain a physical danger to Belinda. Both South and Maternal Grandmother testified regarding how bonded Belinda is to Sharon and opined that possible emotional damage could result if Belinda was required to spend time with Father, who had injured her half-sister to the point that she was on life support and had required brain surgery. The trial court was entitled to find that this factor weighed in favor of termination of Father's parental rights to Belinda.

With regard to Father's parenting abilities, Paternal Great-Grandmother testified that Father had always been good with all the kids in the family; they all

14

loved him and wanted him to play with them.  South testified that the Department had not seen any positive parenting abilities from Father; instead, he had demonstrated an inability to resist taking drugs when he knew he would be the sole caretaker of an infant, a tendency to be violent, and the capability to seriously injure a child.  The trial court was entitled to find that this factor weighed in favor of termination of Father's parental rights to Belinda.

The record did not reveal any programs available to Father while he is in prison.  The record revealed that Maternal Grandmother would be able to obtain funds from the Fostering Connections Program.  The trial court was entitled to find that this factor weighed in favor of termination of Father's parental rights to Belinda.

With regard to the plans for the child, Father planned to obtain employment and provide for Belinda and to spend time with Belinda, doing everything together.  Father also wanted his family to have a role in Belinda's life.  Maternal Grandmother was in the process of becoming a certified foster parent and planned to continue caring for Belinda.  The Department's plan was for the Department to be named permanent managing conservator for six months, allowing Maternal Grandmother to fulfil her six-month licensing requirement as a foster parent, and then to transfer permanent managing conservatorship to Maternal Grandmother.  The trial court was entitled to find that this factor weighed in favor of termination of Father's parental rights to Belinda.

15

With regard to the stability of the home or proposed placement, Father provided no testimony regarding the home that he would provide for Belinda upon his release from prison. Belinda had lived in Maternal Grandmother's home consistently for at least the eleven months preceding the termination trial, and the plan was for her to continue living there. The trial court was entitled to find that this factor weighed in favor of termination of Father's parental rights to Belinda.

With regard to the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, the analysis set forth above—which details Father's incarceration for seriously injuring Sharon, Father's inability to meet Belinda's emotional and physical needs, the threat of future emotional and physical danger that Father poses to Belinda, Father's negative parenting abilities, and Father's drug use—reveals that the existing parent-child relationship between Father and Belinda is not a proper relationship. The trial court was entitled to find that this factor weighed in favor of termination of Father's parental rights to Belinda.

As for any excuse for the acts or omissions of the parent, Father took responsibility for injuring Sharon. He did not give any excuses for his behavior. The trial court was entitled to find that this factor weighed neither in favor of nor against termination of Father's parental rights to Belinda.

Viewing all the evidence in the light most favorable to the best-interest finding and considering the nonexclusive *Holley* factors, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of

16

the parent-child relationship between Father and Belinda was in Belinda's best interest, and we therefore hold the evidence legally sufficient to support the trial court's best-interest finding. Similarly, reviewing all the evidence with appropriate deference to the factfinder, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Father and Belinda was in Belinda's best interest, and we therefore hold that the evidence is factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination); *see also A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 714–16 (Tex. App.—El Paso 2012, no pet.) (holding evidence legally and factually sufficient to support best-interest finding because father was in jail, had failed to support child, and had demonstrated an inability to offer stability or permanence to his child). We overrule Father's sole issue.

17

## IV. CONCLUSION

Having overruled Father's sole issue, we affirm the trial court's judgment terminating his parental rights to Belinda.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DELIVERED:  August 28, 2014